1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8

SALLY D. VILLAVERDE,

9

Petitioner

10

v.

11

WILLIAM HUTCHING, *et al.*,

12

Respondents.

Case No.: 2:21-cv-01595-GMN-BNW

**Order Denying Petition, Denying
Certificate of Appealability and
Closing Case**

13

In his 28 U.S.C. § 2254 Second Amended Habeas Corpus Petition, Sally D.

14 Villaverde challenges his murder conviction, arguing that the State withheld favorable

15 evidence, the trial court erred in allowing certain palm print evidence, and his trial

16 counsel was ineffective for failing to challenge several jury instructions. (ECF No. 23.)

17 The Court has considered the merits of the Petition, and it is denied.

18 **I.    Background**

19

20

In April 2004, a Nevada (Clark County) jury convicted Villaverde of Burglary, First

21 Degree Murder with Use of a Deadly Weapon and Robbery with Use of a Deadly

22 Weapon. (Exh. 99.)[1]  Villaverde was convicted of killing Enrique Caminero after he,

23

----

[1] Exhibits referenced in this Order are found at ECF Nos. 30-55.

Rene Gato, and Robert Castro lured Caminero to a purported drug deal in a Las Vegas motel room. (*See*, *e.g.*, Exh. 87.)  He was sentenced to life in prison without the possibility of parole. (Exh. 105.)  Judgment of conviction was entered on June 10, 2004. (Exh. 115.)  The Nevada Supreme Court affirmed his convictions in February 2006, and affirmed the denial of his state postconviction petition in May 2010. (Exhs. 160, 222.)

Villaverde dispatched his federal Petition for mailing about August, 2021. (ECF No. 6.)  This Court granted Villaverde's motion for appointment of counsel, and he ultimately filed a Second Amended Petition through Criminal Justice Act counsel. (ECF Nos. 5, 23.)  The Court granted Respondents' Motion to Dismiss in part, dismissing five claims. (ECF Nos. 56, 62.)

Three grounds remain before the Court:

> Ground 2: The State violated *Brady v. Maryland*[2] by failing to disclose that Villaverde's co-defendant admitted to strangling the victim.

> Ground 7: Trial counsel was ineffective by failing to object to several jury instructions that related to the crime of conspiracy.

> Ground 8: The trial court violated Villaverde's due process rights by denying his motion in limine regarding the palm print and by allowing an officer to refer to the fingerprint evidence as a "bloody palm print."

(ECF No. 23 at 2-8, 24-28.)

Respondents have now answered the remaining claims, and Villaverde replied. (ECF Nos. 65, 66.)

---

[2] 373 U.S. 83 (1963).

## II.    Trial Testimony[3]

The Court summarizes trial evidence and related state-court record material and proceedings as a backdrop to its consideration of the issues presented in the case.[4] The State read Teresa Gamboa's preliminary hearing testimony into the record because she was unavailable to testify at trial. (Exh. 93 at 71-144.)  Gamboa was Villaverde's girlfriend; they were living together with Gamboa's parents in March 2002.  She was also friends with Gato and Castro who were co-defendants with Villaverde at the time of the preliminary hearing.  On March 5, 2002, Villaverde asked Gamboa to rent a motel room because he, Gato, and Castro were going "to do some business." (*Id*. at 76.) They told her that in return she and Villaverde would get money and drugs.  Gato had a gun, but he left it in Gamboa's garage when Gamboa refused to ride in the car with the gun.  The four drove in Gato's white 4-door sedan[5] to the Capri motel in Las Vegas. Gato gave her a $100 bill; she rented a room using a friend's identification.  They went into the room, looked around briefly, then left.  They dropped Gamboa back at her house.  They opened the garage, and she went inside the house.  Villaverde went

---

[3] The Court notes that the manner in which Respondents' Exhibit Index includes parenthetical additional descriptors of many exhibits significantly aids the Court in reviewing the record.  For example, the trial transcripts include a notation of what each day contains, such as "opening statements" or a list of the witnesses that testified that day.

[4] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record.  The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court.  Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Villaverde's claims.

[5] The parties stipulated that Gato was a registered owner of the vehicle.  (Exh. 88 at 14-15.)

inside; he and Gamboa switched cell phones, he took a taser from her, and the three men drove off.  Villaverde came back around five hours later.  He went straight into the bedroom and into the walk-in closet.  Gamboa followed.  Villaverde dropped to his knees and started crying.  He told her he had blood on his pants and shoes.  Villaverde told her: "he's dead, I think he's dead." (*Id.* at 88.)  Then he said: "No, no, I gave him mouth-to-mouth resuscitation.  He was still – he was still breathing." (*Id.*)  Villaverde said the three had dragged Enrique Caminero into the room.  The victim was screaming, so they tried to duct tape his mouth.  Villaverde duct taped his arms, but Caminero got loose so Gato shot him.  Villaverde retrieved a towel from the bathroom in order to try to apply pressure to the gunshot wound.  When he went back into the room, Castro was strangling Caminero.  Villaverde tried to administer mouth-to-mouth resuscitation on Caminero.  Villaverde heard gurgling.  Gato told them they had to clean everything up; they started wiping everything down.  Villaverde put a bag with items from the room in a Lexus SUV.  It was Gamboa's understanding that the car belonged to Caminero.  Gamboa had seen Caminero a couple of times when he and Villaverde did business together.  Villaverde dumped bloody clothing in the dumpster behind Gamboa's apartment and kept about $400 and some gold jewelry.  The next day, Villaverde drove Gamboa to a court hearing she had to attend, then they drove to Victorville, California and met up with Castro and Gato. They followed them towards Las Angeles, eventually getting a motel room.  Gamboa asked Castro who killed Caminero; he looked towards Gato and said, "we did." (*Id*. at 96.)  The men said that they had been arguing at the time about Caminero getting loose because Villaverde had not restrained him properly.  There was some discussion about a belt, and that they tased

Caminero and Gato shot him.  Castro told her if the police contacted her, she was to say that she knew nothing.  Castro and Gato left.  Gamboa and Villaverde stayed in California, waiting for Castro and Gamboa who were supposed to give Villaverde money.  But they avoided Villaverde's calls, so a few days later, he and Gamboa returned home.  Villaverde pawned the jewelry after they got back.

On cross-examination Gamboa acknowledged that she had told police that she rented the room for a drug deal and that it was possible that a robbery would occur. When Las Vegas Metropolitan Police Department ("LVMPD") Detective Robert Wilson testified about Gamboa's statements to him, he agreed that he and the district attorney had interceded on Gamboa's behalf to get her released early on one of her charges and allowed to re-enroll in drug court. (Exh. 95 at 92-93.)  Wilson said: "I don't recall exactly who made the phone calls or if there were any phone calls made, but we told her that, if she would tell us the truth of what happened, that we wouldn't take her to jail, so we didn't." (*Id*. at 93.)

Leonel Garcia testified that he had been close friends with Caminero, who made a lot of money selling high-quality cocaine. (Exh. at 93 at 11-51.)  He knew Villaverde and Gato.  Beginning in 2000, a man named Francisco Terrazon had approached Garcia several times and asked for his help in kidnapping and robbing Caminero.  A month or two before Caminero's murder, Gato, Castro, and Terrazon went to visit Garcia.  They wanted Garcia to lure Caminero somewhere so that they could kidnap him to find out where he kept his money.  Garcia understood them to mean that they would rob and kill Caminero.  He said the three were known as drug dealers and armed robbers.  Garcia refused to get involved.  He warned Caminero about Terrazon, Gato,

and Castro when he happened to run into him later that same day.  After he heard that Caminero had been killed, he called the victim's mother, who put him in touch with Detective Wilson.  Garcia testified that he told Wilson everything he knew.  Garcia had been in immigration detention with Villaverde in Arizona in 1998 but hadn't seen or heard anything about Villaverde since then.

The manager of the Capri motel, Rogelia Lopez, testified that she was working on the day in question. (Exh. 88 at 4-70.)  She was planting flowers outside about 5 p.m. when a white 4-door car drove up.  The driver asked her in Spanish if there were rooms available; she replied that there were.  The driver turned to a woman in the seat behind him and told her to get out and rent a room.  Lopez described the man in the back seat behind the passenger as a Black man with long, black, curly hair.  She identified Villaverde in court as that man.  The defense noted on the record that the only other Black man in the courtroom was in a police officer's uniform.  Lopez's cousin was working in the office and rented room 10 at the back of the motel to the woman.  The cousin came outside and showed Lopez the photocopy she had made of the ID the woman provided; it did not look like the woman who rented the room.  The four went into the room for 10 or 15 minutes, then got back in the car and left.  She saw Villaverde again about 10 p.m.  She was standing near her mother, who also worked there, when the mother asked Villaverde if he had a room.  Villaverde replied that he was in room 10.  There was no vehicle outside of room 10.  Around midnight Lopez looked out and saw the white car and two other cars parked by room 10; one was a Lexus SUV.  The next morning, Lopez called the room around 10 a.m. to inquire if they were staying another night.  When no one answered she and another employee headed toward the

room with cleaning supplies.  The door was slightly ajar; Lopez pushed it open and entered.  When she walked toward the bed she bumped into the victim's head with her foot.  She ran back to the office and called the police.

The mother, whose name is also Rogelia Lopez, testified that she owned and also lived and worked at the motel.  She saw a man walking in the parking lot between 9:30 and 10:30 p.m. that night and asked him where he was going.  (Exh. 88 at 70-79.) She asked him in English, and he answered in Spanish that he was going to room 10. She is Mexican; she said that she was certain by his accent that the man was either Puerto Rican or Cuban.[6]  She watched him go into room 10.  She identified Villaverde in court as the man.

Detective Wilson testified that through the ID provided to rent the motel room he identified Teresa Gamboa about two and a half months after the murder. (Exh. 95 at 5-120.)  When he first spoke with Gamboa, she told him that Villaverde, Castro, and Gato asked her to rent a room under a fake ID.  She told Wilson that she and Villaverde were supposed to have received $1000 for renting the room.  Wilson ultimately matched Villaverde and Gato with prints recovered at the scene.  In February 2003, Gamboa was in custody based on outstanding warrants, and Wilson interviewed her again.  This time she told Wilson that she had been home watching movies with her father when Villaverde returned that night and hurried into the bedroom, visibly upset, with blood on his clothing.  She said that they had needed money and that the three men were going to set up a "drug rip" to lure Caminero to the motel and steal his money and drugs. (*Id*. at 34-35.)  Gamboa told him that Villaverde had taken some of the victim's jewelry and

---

[6] Villaverde is Cuban. (*See, e.g.*, Exh. 93 at 108, 129.)

had pawned it.  Wilson found records showing Villaverde had pawned some items.
Gamboa said that later Villaverde retrieved the items from the pawn shop and threw
them away.

Wilson said Caminero's mother had been heavily involved in the investigation
and contacted Wilson frequently. Through her Wilson contacted Leonel Garcia.  He
spoke to Garcia on a couple of different occasions; Garcia did not mention Villaverde or
Gamboa or appear to have any connection to either of them.

When Villaverde was arrested on murder charges, Wilson took a videotaped
statement.  Villaverde initially claimed he did not remember if he had been at the motel.
Wilson then asked him if he killed Caminero, which he denied.  They had the following
exchange:

> Q:   Sally, did you kill Enrique Caminero?
>
> A:   No.
>
> Q:   Did you help anyone kill him?
>
> A:   No.
>
> Q:   Was he alive when you left the room?
>
> A:   I don't know.
>
> Q:   Or was he already dead?
>
> A:   I don't know, sir.

(*Id*. at 65.)  Villaverde said he wasn't a person who was capable of killing anyone
and had never robbed anyone.  Wilson testified that Caminero's Lexus SUV was found
at the apartment complex where, according to DMV records, Castro lived.

### III.     AEDPA Legal Standard and Analysis

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the legal standards for this Court's consideration of the Petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002).  This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

1    A state court decision is contrary to clearly established Supreme Court precedent,

2 within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts

3 the governing law set forth in [the Supreme Court's] cases" or "if the state court

4 confronts a set of facts that are materially indistinguishable from a decision of [the

5 Supreme Court] and nevertheless arrives at a result different from [the Supreme

6 Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362,

7 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

8    A state court decision is an unreasonable application of clearly established Supreme

9 Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies

10 the correct governing legal principle from [the Supreme Court's] decisions but

11 unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538

12 U.S. at 74 (quoting *Williams*, 529 U.S. at 413).  The "unreasonable application" clause

13 requires the state court decision to be more than incorrect or erroneous; the state

14 court's application of clearly established law must be objectively unreasonable. *Id.*

15 (quoting *Williams*, 529 U.S. at 409).

16    To the extent that the state court's factual findings are challenged, the

17 "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas

18 review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause

19 requires that the federal courts "must be particularly deferential" to state court factual

20 determinations. *Id.*  The governing standard is not satisfied by a showing merely that the

21 state court finding was "clearly erroneous." 393 F.3d at 973.  Rather, AEDPA requires

22 substantially more deference:

23          .... [I]n concluding that a state-court finding is unsupported by
          substantial evidence in the state-court record, it is not enough that we
          would reverse in similar circumstances if this were an appeal from a

district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

**Ground 2**

Villaverde contends that the State violated his *Brady* rights by failing to disclose Castro's plea agreement in which he pleaded guilty pursuant to *Alford*[7] to voluntary manslaughter. (ECF No. 23 at 5-7.)  He argues that because murder and manslaughter are mutually exclusive, the prosecution presented contradictory theories of criminal liability in his trial.  He insists that if the State had notified him of its decision to consent to the facts in Castro's case, that would have precluded a jury from finding Villaverde guilty of first degree murder, whether based on the felony murder rule or any other theory.

In order to establish a *Brady* violation, a defendant must show: (1) favorable evidence that was exculpatory or impeaching, (2) was suppressed by the prosecution willfully or inadvertently, (3) resulting in prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  To show prejudice, a defendant must demonstrate "there is a

---

[7] *North Carolina v. Alford*, 400 U.S. 25 (1970).

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*Id*. at 280.)

The Nevada Court of Appeals disagreed with Villaverde:

> Second, Villaverde appears to have argued he had good cause based on the State's failure to inform him that his codefendant pleaded guilty to lesser charges, which he claimed violated *Brady v. Maryland*, 373 U.S. 83 (1963). "Good cause and prejudice [to excuse a procedural bar] parallel the second and third *Brady* components; in other words proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice." *State v. Bennett*, 119 Nev. 589, 599, 81 P.3d 1, 8 (2003). An evidentiary hearing is warranted when a petitioner supports his claim with specific facts not belied by the record and that, if true, would entitle him to relief. *Hargrove v. State*, 100 Nev. 498, 502-03, 686 P. 2d 222, 225 (1984).

> Villaverde failed to demonstrate his codefendant's plea was material. His codefendant did not testify at Villaverde's trial and Villaverde failed to demonstrate how his codefendant's plea would have been admissible at trial. Further, his codefendant did not plead guilty until after Villaverde's trial. Therefore, Villaverde failed to demonstrate good cause or prejudice to excuse the procedural bars. Accordingly, we conclude the district court did not err by denying this claim without first holding an evidentiary hearing.

(Exh. 292 at 4-5.)

Villaverde was tried in March 2004; the jury convicted him of First Degree Murder on April 8, 2004. (Exh. 99.)  In January 2005, Castro pleaded guilty to Voluntary Manslaughter by manual strangulation and/or by inflicting multiple blunt force trauma on Caminero. (Exh. 140.)  Specifically, he entered an *Alford* plea agreeing that the State would present sufficient evidence at trial that a jury would convict him of a greater offense or more offenses than Voluntary Manslaughter:

> Robert Castro . . . . did, together with Sally Villaverde and/or Rene Gato, then and there without authority of law, wilfully, unlawfully, and feloniously, without malice and without deliberation kill Enrique Caminero, Jr., a human being, by manual strangulation and/or by inflicting multiple blunt force trauma upon his body, said defendant being liable under one or

more of the following principles of criminal liability, to-wit: (1) by Defendant and/or Sally Villaverde and/or Reno Gato directly committing the acts constituting the offense; and/or (2) by said Defendant and/or Sally Villaverde and/or Rene Gato aiding or abetting each other in its commission by directly or indirectly counseling, encouraging, commanding or procuring the other to commit the offense, as evidenced by the conduct of the Defendant and/or Sally Villaverde and/or Rene Gato before, during and after the offense and/or (3) by conspiring with Sally Villaverde and/or Rene Gato to commit the offense of robbery and/or murder whereby each is vicariously liable for the foreseeable acts of the other made in furtherance of the conspiracy.

(Exh. 140 at 8-9.)

Castro did not testify at Villaverde's trial.  Castro's plea was not favorable or exculpatory evidence as to Villaverde.  It didn't contradict Gamboa's testimony about what Villaverde told her had transpired.  The third theory of the alternatives in particular is that the three men conspired to commit robbery and/or murder such that each is liable for the foreseeable acts of any of them.  And the State could not disclose a plea agreement that was reached 10 months after the verdict in Villaverde's case.  Even if it had been possible to disclose the plea agreement to the defense there is not a reasonable probability that the trial outcome would have been different.  Villaverde cannot demonstrate that the Nevada Court of Appeals' decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Habeas relief on ground 2 is, therefore, denied.

**Ground 8**

Villaverde asserts that the trial court violated his due process rights by denying his motion in limine regarding a palm print and allowing an officer to refer to the fingerprint evidence as a "bloody palm print." (ECF No. 23 at 27-28.)

In *Nevada v. Jackson*, the United States Supreme Court acknowledged that despite the constitutional guarantee to present a complete defense, states retain broad latitude to develop rules of evidence governing presentation and exclusion of evidence in a criminal trial. 569 U.S. 505, 509 (2013); *see Crane v. Kentucky*, 476 U.S. 683, 690 (1984); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  Nevada defines relevant evidence as "evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS 48.015.  (*See also, e.g.*, Fed. R. Evid. 401.) Relevant evidence is only inadmissible if the probative value is substantially outweighed by unfair prejudice or if it confuses the issues or is needlessly cumulative. NRS 48.025; NRS 48.035.

Federal courts may not interfere with a state evidentiary ruling; they may only consider whether the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993).  The Court considers whether the admitted evidence so infected the entire trial with unfairness as to result in a violation of due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Romano v. Oklahoma*, 512 U.S. 1, 12 (1994); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

The Nevada Supreme Court summarily denied this claim without explanation. (Exh. 60 at 6, n.12.)  "When a federal claim has been presented to a state court and the state has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

Villaverde's counsel filed a pre-trial motion in limine to exclude the forensic laboratory report that showed that Villaverde's "palm print is found [in the motel room bathroom] with a 'blood like' tinge or pallow." (Exh. 77 at 4.)  Defense counsel sought to have the report excluded as unduly prejudicial because it created the impression that this is a bloody palm print without any DNA testing to determine whether it was a bloody fingerprint or was instead a print that touched a bloody surface.  The prosecution explained to the court that the crime scene analyst described Villaverde's prints as bloody because his prints were collected from surfaces that had been bloody and that were wiped down before investigators' arrival the crime. (Exh. 78 at 70-79.)

LVMPD Crime Scene Analyst Joseph Matvay testified that he responded to the homicide scene. (Exh. 88 at 140-172; Exh. 90 at 3-47.)  He explained that a particular photograph showed part of the bathroom sink counter and "a latent palm print impression associated with blood." (Exh. 90 at 17.)  When he observed a dried liquid that had a pinkish or slight reddish hue on the sink counter, he did a presumptive test for blood.  He agreed that the palm print could have been placed after the counter was cleaned as opposed to that being the print of the person who did the cleaning. (*Id*. at 38, 42.)

In closing arguments, defense counsel argued that Villaverde and Gamboa were involved in renting the motel room, but that Villaverde knew nothing of a plan to rob and kill Caminero. (Exh. 97 at 36-71.)  Counsel acknowledged that evidence showed that Villaverde was present in the motel room: "there's some evidence that he tried to save a life here, that he did CPR." (*Id*. at 44.)  The State did not argue that Villaverde shot or strangled the victim.

Villaverde has not shown that the court improperly admitted the print evidence. The print evidence certainly did not render the entire trial with unfairness and violate his due process rights when defense counsel acknowledged that Villaverde had been present.  The trial testimony also made clear that it was impossible to determine whether Villaverde had blood on his hand or had placed his hand on a surface that had blood on it or had had blood wiped off of it.  He has not shown that the Nevada Court of Appeals' denial of federal ground 8 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court accordingly denies habeas relief on ground 8.

**Ground 7**

Villaverde argues that his trial counsel was ineffective for failing to challenge several jury instructions related to the crime of conspiracy.  Ineffective assistance of counsel ("IAC") claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating

16

that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*.  To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.  A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*.  Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).  When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466

U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

Here, Villaverde argues that his counsel was ineffective for failing to object to eight jury instructions related to the crime of conspiracy.[8]  He asserts that the instructions were inflammatory and prejudicial and that the prosecution presented no independent evidence that Villaverde participated in any conspiracy.

The Nevada Supreme Court held that any objection would have been futile:

> Fourth, appellant claims that his trial counsel was ineffective for failing to object to eight instructions relating to the crime of conspiracy when appellant was not charged with conspiracy. Appellant fails to demonstrate that trial counsel performance was deficient because one of the State's theories of criminal liability for the crime of murder and robbery was co-conspirator vicarious liability. The State is allowed to pursue alternative theories of criminal liability and it is not error for the district court to instruct the jury on conspiracy when it is pleaded in the information as an alternate theory of criminal liability. *See Walker v. State*, 116 Nev. 670, 673-74, 6 P.3d 477, 479 (2000). Thus, trial counsel was not deficient for failing to make a futile objection. *See Donovan v. State*, 94 Nev. 671, 675, 584 P.2d 708, 711 (1978) (noting that counsel cannot be deemed ineffective for failing to file futile motions). Therefore, the district court did not err in denying this claim without an evidentiary hearing.

(Exh. 222 at 4-5.)

The Amended Information charged Villaverde with Burglary, Murder with Use of a Deadly Weapon (Open Murder), and Robbery with Use of a Deadly Weapon. (Exh. 80.) The Robbery and Murder counts both set forth theories of co-conspirator vicarious criminal liability.  The Murder count states:

> …Defendant being responsible [for murder] under one or more of the following principles of criminal liability, to-wit: (1) by Defendant directly committing the acts constituting the offense; and/or (2) by said Defendant

---

[8] Jury instructions 26-30, 32, 33, and 35. Exh. 98 at 29-33, 35-36, 38.

aiding or abetting others in its commission by directly or indirectly counseling, encouraging, commanding or procuring the others to commit the offense, as evidenced by the conduct of the Defendant before, during and after the offense and/or (3) by conspiring with others to commit the offense of robbery and/or murder whereby each conspirator is vicariously liable for the foreseeable acts of the other made in furtherance of the conspiracy.

(*Id.* at 3.)

Villaverde insists trial counsel should have objected to the following jury instructions.

Instruction No. 26:

Where the purpose of the conspiracy is to commit a dangerous felony each member runs the risk of having the venture end in homicide, even if he has forbidden the others to make use of deadly force. Hence each is guilty of murder if one of them commits homicide in the perpetration of an agreed-upon robbery.

(Exh. 98 at 29.)

Instruction No. 27:

Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or conspires with others to commit the offense or aids or abets in its commission, and whether present or absent, and every person who, directly or indirectly, counsels, encourages, hires, commands, induces or otherwise procures another to commit a crime, with the intent that the crime be committed, is a principal, and shall be proceeded against and punished as such.

(*Id.* at 30.)

Instruction No. 28:

It is not necessary in proving a conspiracy to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation and existence of a conspiracy may be inferred from all the circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence, or by both direct and circumstantial evidence.

(*Id.* at 31.)

Instruction No. 29:

      A conspiracy is an agreement or mutual understanding between two or more persons to commit a crime.  In order to establish the existence of a conspiracy, it must be proven that the parties to the conspiracy had a specific intent to commit, or to aid in the commission of, the specific crime agreed to.

(*Id*. at 32.)

Instruction No. 30:

      Whenever there is slight evidence that a conspiracy existed, and that the defendant was one of the members of the conspiracy, then the statements and the acts by any person likewise a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

(*Id*. at 33.)

Instruction No. 32:

      A statement offered against the defendant which is a statement made by a co-conspirator of the defendant during the course and in furtherance of the conspiracy may be considered by the jury.

(*Id*. at 35.)

Instruction No. 33:

      To decide whether the conspiracy theory of criminal liability in the amended information applies in this case, you must find that a conspiracy existed, and if it did, that the defendant was one of its members.  If you find that the conspiracy did not exist, you may not find the defendant guilty under the conspiracy theory of criminal liability, even though you may find that some of the conspiracy existed, and the defendant may have been a member of some other conspiracy.

(*Id*. at 36.)

Instruction No. 35:

> A member of a conspiracy is liable for the acts and declarations of his co-conspirators until he effectively withdraws from the conspiracy or the conspiracy has terminated.
>
> In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge.
>
> If a member of a conspiracy has effectively withdrawn from the conspiracy he is not thereafter liable for any act of the co-conspirators committed after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member.

(*Id.* at 38.)

The State presented evidence that Villaverde and Caminero had conducted drug deals in the past, usually short encounters in a bar. (Exh. 93 at 116.)  Gamboa testified that Villaverde asked him to rent the room in order that he, Castro, and Gato could conduct business.  She also testified that she and Villaverde were to receive drugs and money for their roles and that Villaverde had told the other men as the four drove to the motel that Gamboa did not know everything about what was to happen at the motel.  Gamboa told Detective Wilson that the men planned to lure Caminero to the motel in order to rob him.  This evidence supports the instruction about when the purpose of a conspiracy is to commit a dangerous felony (No. 26.)  Gamboa testified that Villaverde told her that he, Castro, and Gato dragged a screaming and struggling Caminero into the room, and Villaverde restrained him with duct tape.  Villaverde also told her he saw Castro strangle Caminero.  That evidence directly supports the instructions that each member of the conspiracy runs the risk of having the conspiracy end in homicide and defining a principal actor in the conspiracy. (Nos. 26 and 27.)

Gamboa testified that Villaverde, Castro and Gato discussed the murder with her at the California motel.  Gamboa asked Castro who killed Caminero, and Castro replied, "We did."  Such evidence supports the instructions that a conspiracy may be inferred from all the circumstances, that intent to commit robbery or burglary is an element of felony murder, that the jury is to consider the statements and acts of the parties to the conspiracy determine whether a conspiracy existed, and that the jury is required to find that a conspiracy existed and that Villaverde was a party who participated in the conspiracy.  (Nos. 28-30, 32, 35.)

The State presented evidence that Villaverde cleaned the crime scene, disposed of items belonging to Caminero, pawned his jewelry, and later retrieved the jewelry from pawn and discarded it.  This evidence supports instructions that a party to the conspiracy remains liable for the acts of the other members until he effectively withdraws from the conspiracy, or the conspiracy has terminated. (No. 35.)  The prosecution presented ample evidence to support conspiracy instructions.

There was no reasonable probability that any objection to the instructions would have succeeded.  Counsel cannot have been ineffective for failing to raise futile objections to the jury instructions on conspiracy.  Villaverde cannot demonstrate that the Nevada Court of Appeals' decision on federal ground 7 was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court denies habeas relief on ground 7.

The petition, therefore, is denied in its entirety.

### V. Certificate of Appealability

This is a final order adverse to the Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Having reviewed its determinations and rulings in adjudicating Villaverde's petition, the court finds that none of those rulings meets the *Slack* standard.  The Court therefore declines to issue a certificate of appealability for its resolution of Villaverde's Petition.

### VI. Conclusion

It is therefore ordered that the Second Amended Petition (ECF No. 23) is **DENIED**.

It is further ordered that a Certificate of Appealability will not issue.

The Clerk of the Court is directed to enter Judgment accordingly and close this case.

DATED: 18 September 2024.

GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE